STATE v. EUGENE CANIPE.

(Filed 7 April, 1954.)

**1. Constitutional Law § 34a—**

Every person charged with crime has an absolute right to a trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm.

**2. Criminal Law §§ 51, 53d: Trial § 18—**

It is the duty of the judge alone to decide the legal questions presented at the trial, and to instruct the jury as to the law arising on the evidence given in the case.

**3. Criminal Law § 51: Trial § 19—**

It is the task of the jury alone to determine the facts of the case from the evidence adduced.

**4. Criminal Law § 50d: Trial § 6: Jury § 4—**

The judge is forbidden to convey to the jury in any way at any stage of the trial his opinion on the facts involved in the case, and the trial begins within the purview of this rule when the prospective jurors are called to be examined touching their fitness to serve on the trial jury. G.S. 1-180.

**5. Same—**

Whether the conduct or the language of the judge amounts to an expression of his opinion on the facts is to be determined by its probable meaning to the jury, and not the motive of the judge.

**6. Same—**

Where the court, in interrogating prospective jurors in regard to their scruples against capital punishment, refers to several celebrated cases and asks them, in the presence of those immediately thereafter impaneled to try the case, whether they would not render a verdict calling for the death sentence in such cases, defendant must be awarded a new trial notwithstanding that the court thereafter cautions them that he did not mean to compare the case at issue with the other cases.

**7. Criminal Law § 81c (7)—**

Error committed by the court in inadvertently expressing an opinion on the facts is virtually impossible to cure, and certainly is not rendered harmless by a statement of the court that if any juror had the impression that the court had expressed such an opinion the court would release him from the jury.

INDICTMENT charging the prisoner Eugene Canipe with the first degree murder of his wife Delores Hamrick Canipe tried by *Pless, J.,* and a jury, at the January Term, 1954, of CLEVELAND.

The trial jury was chosen from the regular panel and a special venire.

After one of the trial jurors had been selected and sworn, George L. Willis, a prospective juror, stated on his *voir dire* that he had conscien-

tious scruples against capital punishment, and was challenged by the State for cause. Before allowing the challenge, the trial judge had this colloquy with Willis in the presence of the trial juror and the other prospective jurors:

"Q. You do not think the death penalty ought to be inflicted for any crime under any conditions? A. I will not say that.

"Q. It is not what you prefer. The law says there are four offenses for which the penalty shall be death. Would you find him guilty of the charge of first degree murder when it meant that he would be put to death? A. I am afraid to say.

"Q. You told the Solicitor that your religion was against it, and you tell me that you cannot say that you are against it; would you be willing to follow the law of your State? A. Yes, Sir.

"Q. And if you found the defendant to be guilty of first degree murder, would you render that verdict? A. If that would be the law, and if I agreed I would have to do it, but it would still be against my religion.

"Q. Would you feel that you had been guilty of doing something wrong yourself if you voted for it? A. According to the Bible, I would.

"Q. Did you read about the Greenlease case? A. Yes, Sir.

"Q. Do you think they ought not to have been put to death? A. I did not take any thought as to that.

"Q. You are not saying this just to get off the jury, are you? A. No, Sir."

After three of the trial jurors had been selected and sworn, Mrs. Zella Blanche Gantt, a prospective juror, stated on her *voir dire* that she had conscientious scruples against capital punishment, and was challenged by the State for cause. Before allowing the challenge, the trial judge had this colloquy with Mrs. Gantt in the presence of the three trial jurors and the other prospective jurors:

"Q. Are you against capital punishment in every case? A. Yes.

"Q. I'm not comparing that case with this one, but do you mean to say that you would not have put the defendants to death in the Green-lease kidnapping case that happened lately where they had planned to kill the child and had dug his grave before kidnapping him? A. I wouldn't be in favor of capital punishment there.

"Q. What about this case that happened in Germany during the war where a German officer lined up 50 American boys facing the wall and shot them in the back in cold blood? The officer was tried after the war and given the death sentence. Could you have participated in such a verdict? Do you mean to say that you wouldn't give him death? A. I wouldn't.

"Q. What punishment would you give in such a case? A. I think life imprisonment would be a more severe punishment."

After three of the trial jurors had been selected and sworn, Miss Eva P. Moore, a prospective juror, stated on her *voir dire* that she had conscientious scruples against capital punishment, and was challenged by the State for cause. Before allowing the challenge, the trial judge had this colloquy with Miss Moore in the presence of the three trial jurors and the other prospective jurors:

"Q. You have told the Solicitor you did not believe this defendant should be put to death. Is that because you do not believe in capital punishment, or because you do not think he is guilty? A. Yes, Sir, he's guilty because he said he was, but I don't think he should pay for it with his life.

"Q. Do you think that you would be committing a wrong to participate in a verdict that would result in the death sentence for this defendant regardless of what the evidence is? A. I think he should have punishment meted out to him, but I think it wrong to take life under those circumstances."

· After seven of the trial jurors had been selected and sworn, David Dellavy, a prospective juror, stated on his *voir dire* that he had conscientious scruples against capital punishment, and was challenged by the State for cause. Before allowing the challenge, the trial judge had this colloquy with Dellavy in the presence of the seven trial jurors and the other prospective jurors:

"Q. You do not believe in capital punishment in the Greenlease case? A. They play up a lot of stuff and put in a lot of stuff in there."

After the twelve trial jurors were selected and sworn, but before they were impaneled, the trial judge made this statement to them: "Gentlemen of the Jury. In order to test the sincerity of the statements made by the jurors as they came to be questioned, I have asked questions as to the extent of their belief, and mentioned the Greenlease case and the case of the murderers of the 50 Americans in Germany. I do not have any idea that anybody could possibly believe that the court was comparing the Greenlease case and the case of the murder of the American soldiers with this case. I do not know anything as to the facts in this case; but in order to be sure that the defendant has not been prejudiced because of those questions, I would like for you to let me know now if anyone on the jury got the impression that the court was comparing this case to any other case. The defendant is entitled to a jury with no prejudice, and the mere fact that he is charged with a violation of the law which, under certain circumstances, would (require that he) be put to death, doesn't mean that his case is to be compared. Let me know that now so I can release you from serving on this jury."

The twelve trial jurors remained silent, and were thereupon impaneled to try the cause.

Both sides offered evidence. The trial judge charged the jury that it could return one of these verdicts: (1) guilty of murder in the first degree; (2) guilty of murder in the first degree with recommendation that the punishment be imprisonment for life in the State's prison; (3) guilty of murder in the second degree; (4) guilty of manslaughter; or (5) not guilty.

The jury returned a verdict finding the prisoner guilty of murder in the first degree, but did not recommend that his punishment should be imprisonment for life in the State's prison. The trial judge entered judgment that the prisoner suffer death by the administration of lethal gas, and the prisoner excepted and appealed, assigning errors.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*Horn & West and A. A. Powell for the prisoner.*

ERVIN, J. Every person charged with crime has an absolute right to a fair trial. By this it is meant that he is entitled to a trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. *S. v. Carter,* 233 N.C. 581, 65 S.E. 2d 9.

We are confronted at the threshold of this appeal by the assignments of error which assert, in essence, that the able and just presiding judge unintentionally impaired the fundamental right of the prisoner to have his cause determined by an unprejudiced jury in an atmosphere of judicial calm by the questions he put during the selection of the jury to prospective jurors who professed conscientious scruples against capital punishment. The questions were asked in the hearing of the twelve jurors who were immediately impaneled to pass between the State and the prisoner upon his life and death.

The founders of our legal system intended that the right of trial by jury should be a vital force rather than an empty form in the administration of justice. They realized that this could not be if the trial jury should become a mere unthinking echo of the judge's will. To forestall such eventuality, they clearly demarcated the respective functions of the judge and the jury in both civil and criminal trials in a familiar statute, which was enacted in 1796, and which originally bore this caption: "An act to secure the impartiality of trial by jury, and to direct the conduct of judges in charges to the petit jury." Potter's Revisal, Vol. 1, Ch. 452. This statute, which now appears as G.S. 1-180, establishes these basic propositions: (1) That it is the duty of the judge alone to decide the legal questions presented at the trial, and to instruct the jury as to the law arising on the evidence given in the case; (2) that it is the task of the jury alone to determine the facts of the case from the evidence ad-

duced; and (3) that "no judge, in giving a charge to the petit jury, . . . shall give an opinion whether a fact is fully or sufficiently proven, that being the true office and province of the jury." This statute is designed to make effectual the right of every litigant to have his cause considered with the "cold neutrality of the impartial judge" and the equally unbiased mind of a properly instructed jury. *In re Will of Bartlett,* 235 N.C. 489, 70 S.E. 2d 482.

Although the statute refers in terms to the charge, it has always been construed to forbid the judge to convey to the trial jury in any way at any stage of the trial his opinion on the facts involved in the case. *In re Will of Bartlett, supra; S. v. Gibson,* 233 N.C. 691, 65 S.E. 2d 508; *S. v. Simpson,* 233 N.C. 438, 64 S.E. 2d 568; *S. v. McNeil,* 231 N.C. 666, 58 S.E. 2d 366; *Bailey v. Hayman,* 220 N.C. 402, 17 S.E. 2d 520; *S. v. Oakley,* 210 N.C. 206, 186 S.E. 244; *S. v. Bryant,* 189 N.C. 112, 126 S.E. 107; *Morris v. Kramer,* 182 N.C. 87, 108 S.E. 381; *S. v. Rogers,* 173 N.C. 755, 91 S.E. 854, L.R.A. 1917E, 857; *S. v. Cook,* 162 N.C. 586, 77 S.E. 759; *Park v. Exum,* 156 N.C. 228, 72 S.E. 309; *S. v. Swink,* 151 N.C. 726, 66 S.E. 448, 19 Ann. Cas. 422; *Withers v. Lane,* 144 N.C. 184, 56 S.E. 855; *S. v. Davis,* 136 N.C. 568, 49 S.E. 162; *Marcom v. Adams,* 122 N.C. 222, 29 S.E. 333; *S. v. Brouning,* 78 N.C. 555.

The trial of a case begins within the purview of the statute when the prospective jurors are called to be examined touching their fitness to serve on the trial jury. *Lipscomb v. State,* 76 Miss. 223, 25 So. 158; *State v. Neal,* 350 Mo. 1002, 169 S.W. 2d 686; *Simmons v. State,* 4 Okl. Cr. 490, 114 P. 752. This being so, it is a violation of the statute for the judge to communicate his opinion on the facts in the case to the trial jury by his remarks or questions to prospective jurors during the selection of the trial jury. *State v. Diedtman,* 58 Mont. 13, 190 P. 117; *State v. Ferguson,* 48 S.D. 346, 204 N.W. 652. See, also, in this connection: *Manuel v. United States,* 254 F. 272; *People v. Wilson,* 334 Ill. 412, 166 N.E. 40; *State v. Smith,* 216 La. 1041, 45 So. 2d 617; *Phenizee v. State,* 180 Miss. 746, 178 So. 579.

The judge occupies an exalted station, and jurors entertain a profound respect for his opinion. *S. v. Carter, supra.* As a consequence, the judge prejudices a party or his cause in the minds of the trial jurors whenever he violates the statute by expressing an adverse opinion on the facts. When this occurs, it is virtually impossible for the judge to remove the prejudicial impression from the minds of the trial jurors by anything which he may afterwards say to them by way of atonement or explanation. *S. v. Cantrell,* 230 N.C. 46, 51 S.E. 2d 887; *Thompson v. Angel,* 214 N.C. 3, 197 S.E. 618; *S. v. Winckler,* 210 N.C. 556, 187 S.E. 792; *S. v. Oakley, supra; S. v. Bryant, supra; S. v. Hart,* 186 N.C. 582, 120 S.E. 345; *Morris v. Kramer, supra; S. v. Rogers, supra; Bank v. McArthur,*

168 N.C. 48, 84 S.E. 39; *Speed v. Perry,* 167 N.C. 122, 83 S.E. 176; *S. v. Harris,* 166 N.C. 243, 80 S.E. 1067; *S. v. Cook, supra; Withers v. Lane, supra; S. v. Caveness,* 78 N.C. 484; *S. v. Dick,* 60 N.C. 440.

Whether the conduct or the language of the judge amounts to an expression of his opinion on the facts is to be determined by its probable meaning to the jury, and not by the motive of the judge. *S. v. Oakley, supra; S. v. Bryant, supra; Morris v. Kramer, supra; S. v. Ownby,* 146 N.C. 677, 61 S.E. 630.

The law imposed upon the trial jury alone the function of determining the factual issue whether the prisoner was guilty of murder in the first degree. The law likewise imposed upon the trial jury alone the function of deciding whether it should exercise its discretionary power to fix the punishment of the prisoner at life imprisonment rather than death in the event it found him guilty of murder in the first degree. G.S. 14-17.

When the able and just presiding judge propounded his questions to the prospective jurors who professed conscientious scruples against capital punishment, he did not intend to influence the jury in the discharge of either of these functions by an expression of his opinion on the facts involved in the case. He was actuated by a salutary motive. He was endeavoring to ascertain the validity and the strength of the scruples professed by the prospective jurors with the sole object of determining whether they could approach the issue of capital punishment with the proper attitude.

But when his questions are read in the light of their probable meaning to the twelve persons who were immediately impaneled to serve as trial jurors, it is apparent that in legal contemplation the presiding judge inadvertently over-stepped his self-appointed bounds and unintentionally expressed an opinion on the facts adverse to the prisoner. This is true because the questions had a logical tendency to implant in the minds of the trial jurors the convictions that the presiding judge believed that the prisoner had killed his wife in an atrocious manner, that the prisoner was guilty of murder in the first degree, and that the prisoner ought to suffer death for his crime.

The Attorney-General contends, however, that the presiding judge made an explanatory statement just before the impanelment of the trial jury in which he offered to excuse from service on that body any of the trial jurors who might have been prejudiced against the prisoner by his questions, that none of the trial jurors accepted the offer, and that the nonacceptance of the offer by the trial jurors shows that the explanatory statement of the presiding judge removed from their minds any prejudicial impressions created by any expression of his opinion on the facts embodied in his questions.

We would be unable to accept as valid the Attorney-General's contention even if we were at liberty to ignore the numerous decisions holding that it is virtually impossible to erase from the minds of jurors prejudicial impressions resulting from the expression by the trial judge of his opinion on the facts. The Attorney-General overlooks the significant circumstance that the offer of the presiding judge was conditional and not absolute. When his explanatory statement is read aright, it appears that he offered to release prejudiced persons from service on the trial jury if, and only if, they first met two conditions. The first condition was, in essence, that they should make a confession in open court that their minds were prejudiced against the prisoner, and the second condition was, in substance, that they should make an accusation in open court that the presiding judge himself had instilled the prejudice in their minds. Each condition was sufficient in itself to deter the trial jurors from accepting the offer.

For the reasons given, we are compelled to sustain the assignments of error under scrutiny. This necessitates a new trial, and renders it unnecessary for us to discuss the remaining assignments of error. We deem it advisable to note, however, that we have examined the remaining assignments of error with care, and have found them to be untenable.

New trial.